# IN THE COURT OF APPEALS OF IOWA

———————————

No. 25-2018
Filed June 10, 2026

———————————

**In the Interest of J.D., K.D., and J.D.-W, Minor Children,**

**S.D., Mother,**
Appellant.

———————————

Appeal from the Iowa District Court for Des Moines County,
The Honorable Emily Dean, Judge.

———————————

**AFFIRMED**

———————————

Kimberly A. Auge of The Auge Law Firm, Fort Madison,
attorney for appellant mother.

Brenna Bird, Attorney General, and Mackenzie Moran, Assistant Attorney
General, attorneys for appellee State.

Reyna L. Wilkens of Wilkens Law Office, Fort Madison, attorney and
guardian ad litem for minor children.

———————————

Considered without oral argument
by Schumacher, P.J., and Ahlers and Badding, JJ.
Opinion by Schumacher, P.J.

**SCHUMACHER, Presiding Judge.**

A mother appeals the termination of her parental rights to three children: J.D., born in 2020; K.D., born in 2021; and J.D.-W., born in 2024.[1] The mother claims the district court erred in concluding the children could not safely be returned to her custody and by denying her request for additional time to work toward reunification. The mother further argues that termination is not in the children's best interests and the Iowa Department of Health and Human Services failed to provide reasonable efforts to assist with reunification. Upon our review, we affirm.

## BACKGROUND FACTS AND PROCEEDINGS

This family most recently came to the department's attention in February 2024, when J.D.-W. tested positive for marijuana at birth.[2] Voluntary services were initiated, but the mother refused to participate in drug testing over the next few months. In April, she attended a drug test, but the mother was alleged to have tampered with the test. The mother failed to cooperate with the department caseworker's attempts to visit the family, and concerns grew about incidents where the children were left unattended. A child abuse assessment was founded for denial of critical care, and failure to provide proper supervision.

---

[1] The father's parental rights were also terminated. He does not appeal.

[2] The older two children were previously adjudicated children in need of assistance (CINA) due to similar concerns as the present case. In addition, the parents have a history of domestic violence, and a no-contact order was entered between them in 2021 following the father's arrest for domestic abuse. That CINA case was closed in December 2023, and the children were returned to the mother's custody.

The children were removed from the parents' custody in June,[3] after the mother completed a hair stat test that was positive for methamphetamine and ecstasy. The mother denied using either substance and maintained she was drugged. The children were then tested; all three tested positive for marijuana, and K.M. also tested positive for cocaine. The father had been in jail after being convicted of carrying a dangerous weapon while under the influence, but he was released and present at the family home at the time of removal.

The children's great-grandmother, a placement from the prior CINA case, agreed to be a temporary placement option for all three children. Shortly thereafter, the children were placed together with a family friend in Burlington. The children were adjudicated CINA.

The department's November report indicated the mother was becoming "more cooperative with services." The mother stated she last used marijuana the day the children were removed. The mother maintained that she was not drinking or partying, but the caseworker reported otherwise. The father was not participating in services. The guardian ad litem (GAL) reported the parents had "made minimal progress" and the children exhibited negative behaviors after visits. The court entered a dispositional order in November that maintained the status quo.

The father was arrested in December for domestic abuse against the mother and possession of a controlled substance. A no-contact order was entered between the parents, which they did not follow, contrary to the mother's reports that she was no longer in a relationship with the father. The

---

[3] It was discovered that the mother had an outstanding warrant for failure to appear, and she was briefly detained.

mother acknowledged that their relationship was not healthy and that she was essentially choosing the father over the children. The father continued to be uncooperative with services. Meanwhile, the children were coping with several moves between different placements.

The mother began semi-supervised visits in April 2025. The case manager noted the mother had difficulty managing all three children, who were described as "active and requir[ing] constant supervision." The older two children struggled with tantrums and exhibited physical aggression.

That same month, the father was arrested for violating the no-contact order after he and the mother were found in her car together. When they were pulled over, the mother gave the police the wrong name and reported she was unaware of the no-contact order. She later told a different story to the department, stating she told the father to leave but he took her phone and keys. Around the same time, the mother was arrested for driving while barred. The arrest took place as she was entering a liquor store. The mother maintained that she was not drinking but was taking her friend to the store. The mother also allowed her sister, who was in residential treatment, to stay in her home, resulting in the police being called. The mother's visits with the children reverted to fully supervised. The GAL reported the mother "continues to be unable to show an understanding of how her decisions affect the overall care and stability of the children," opining "[s]he has not internalized what is needed to make the necessary long-term changes to ensure safety and stability for her children."

A permanency hearing took place over two days in June, after which the court directed the State to initiate termination proceedings.

The termination hearing took place in October. The father acknowledged he had not participated in services. To the department's knowledge, he had last seen the children in November 2024.

The mother testified that she was ready to take the children home "today." She described her bond with the children as "[l]oveable, very consistent, a lot of structure." She acknowledged that her relationship with the father was "toxic and unsafe" and she had learned to "cut all ties" with him and put her children first. She testified that if the father contacted her, she would stay away from him unless "what needs to be done is respected." The mother maintained that "[b]efore, I did not know exactly what was being asked of me, but I do now."

However, the mother's lack of honesty continued to be a concern for the department.[4] For example, at the permanency hearing, the mother maintained her sober date was in June 2025. However, the department caseworker reported that the mother left her driver's license in a bar in September. The mother then indicated a different sober date "over a year

[4] The mother also claimed dishonesty on the part of the department, pointing out that "the State has gone so far to forge the mother's name on a document refusing services for one of the children." The background on this claim is not clear from the record, but the mother testified that she was concerned that her initials were filled in by the caseworker on a "refusal of services" because she felt it "could be used against [her] to prevent [her] from getting [her] children back." The caseworker acknowledged that she wrote the mother's initials on a release for K.D. so the child was able to receive behavioral health intervention services (BHIS). The caseworker explained that the mother had filled out the form except for one section, so the caseworker "thought she had missed putting her initials in [that] section." Because the BHIS provider was "going to the home that night to see [K.D.]" and the mother was not available, the caseworker filled out the remaining section so K.D. "would get those services that night." The caseworker acknowledged that her action "would create some distrust [for the mother] with the department."

ago." The caseworker stated, "It feels as though at times [the mother] will say that she believes that alcohol is a concern, and then at other times she doesn't feel that it is, and so it kind of feels that she's just saying what she feels she needs to say rather than actually addressing her substance use."

The mother acknowledged that her relationship with the father had a history of being violent and toxic. But the mother maintained she was no longer in the relationship and that her last contact with him was in March. She then agreed she had been with him in April, when he was charged with violating the no-contact order. The caseworker testified, "Throughout the history of this case and the prior case, they have always ended up back in a relationship together, often without the knowledge of the [d]epartment."

The department and GAL agreed that the mother had not yet taken accountability for the issues causing the department's involvement with her family. The caseworker recommended termination of the mother's parental rights "due to the lack of accountability, continuing to blame others, and the lack of fully addressing the concerns that are the reason we became involved," explaining that "[w]hen you lack accountability, you can't make the changes necessary to address those concerns." The GAL concurred with that recommendation.

The caseworker testified that the children had spent a "[v]ery large portion" of their lives with department involvement.[5] And she opined that continued involvement would "be very difficult" for the children—"[i]t's continued trauma and continuing to have to address that trauma." J.D. and J.D.-W. had been placed together for approximately eight months, where they

---

[5] The caseworker testified the family was "at roughly forty-four-and-a-half months' of services" over the two CINA cases.

were "doing very well." The department intended for the three children to be placed together, but K.D.'s behaviors were "more extreme," and the three children were "too much to handle." K.D. had been placed in ten separate foster homes. He was receiving services and medication to help stabilize his behavior. K.D. was the only child in his current placement, and his foster mother reported his tantrums had significantly decreased. The foster homes were both pre-adoptive placements.

Following the hearing, the court entered an order terminating both parents' rights pursuant to Iowa Code section 232.116(1)(f) (2025) as to J.D. and section 232.116(1)(h) as to K.D. and J.D.-W.[6] The mother appeals.

## ISSUES ON APPEAL

We employ the familiar statutory framework analysis on our de novo review of this case. *In re P.L.*, 778 N.W.2d 33, 40 (Iowa 2010). But if a parent does not challenge a step on appeal, then we do not address it. *See id.*

---

[6] In the conclusions and decretal portions of the termination ruling, the court stated the mother's parental rights were terminated under section 232.116(1)(f) as to both J.D. and K.D. and section 232.116(1)(h) as to J.D.-W. We believe this was a typographical error because paragraph (f) applies to children who are four years of age or older, and paragraph (h) applies to children who are three years of age or younger. Iowa Code § 232.116(1)(f)(1), (h)(1). The record accurately states K.D.'s birthdate, which placed him one month shy of four years old at the time of the termination hearing. The mother does not challenge the error, conceding K.D.'s removal exceeds either statutory requirement. "[W]e decline to place form over substance and waste judicial resources on what was clearly a clerical error." *In re H.C.*, No. 16-1961, 2017 WL 512798, at *2 (Iowa Ct. App. Feb. 8, 2017); *see In re A.A.*, No. 21-1972, 2022 WL 946503, at *3 (Iowa Ct. App. Mar. 30, 2022) ("The erroneous reference to paragraph (f), a presumed typographical error, therefore has no legal significance." (cleaned up)).

## I. Grounds for Termination

The mother challenges only the fourth element of paragraphs 232.116(1)(f) and (h), which requires the State to prove by clear and convincing evidence that the children cannot be safely returned to her custody at the present time. *See In re A.S.*, 906 N.W.2d 467, 473 (Iowa 2018) (interpreting the statutory phrase "at the present time" to mean at the time of the termination hearing). The mother maintains "[t]he Court erred in finding clear and convincing evidence that the children could not be returned to [her]."

At the termination hearing, the mother disputed the notion that she had just been "checking boxes" rather than making meaningful progress. The mother testified she had "grown a lot" and learned to "[s]tay away from toxic people, set boundaries, and call the police if something comes up, stay in contact with [her] supports." We commend the mother's recent efforts to acknowledge the safety concerns associated with violent relationships, including her relationship with the father. But we cannot ignore her decisions to continue having contact with the father during two CINA proceedings—in violation of court orders—and to fabricate stories about her contact. *See In re K.B.*, No. 24-1734, 2025 WL 271642, at *4 (Iowa Ct. App. Jan. 23, 2025) (agreeing the father's perpetration of domestic violence was "not [the mother's] fault" but finding "her choices to allow the father around [the child] without department supervision . . . and to maintain a romantic relationship with a man who, in her own estimation, has strangled her about ten different times are her responsibility"). And that is aside from the mother's actions that exposed the children to substance use. These children need and deserve a safe caregiver. Following our review, we conclude the

State proved the children could not be safely returned to the mother at the time of the termination hearing.

## II. Additional Time to Work Toward Reunification

The mother further claims the court erred in concluding "that if given an additional six months the need for removal of the children would not have been eliminated." *See* Iowa Code § 232.117(5) (permitting the court to deny termination and enter a permanency order under section 232.104); *see also id.* § 232.104(2)(b) (providing a permanency option of giving a parent an additional six months to work toward reunification). An extension of time is appropriate only if "the need for removal . . . will no longer exist at the end of the additional six-month period." *Id.* § 232.104(2)(b).

The mother claims that she should have been granted additional time because she "met each of the [department's] requirements, had no positive drug tests for over one year, had no contact with the father for over six months, had maintained stable housing and employment, and was continuing to be committed going into the future." The mother's claim is appealing at first blush. But the fact remains that at the time of the termination hearing, the mother had only recently begun to acknowledge that some of her actions had placed the children at risk. And the mother's visits with the children were fully supervised. Indeed, immediately after the mother progressed to semi-supervised visits, she and the father were discovered together in violation of the no-contact order. That was in April, yet the mother testified her last contact with the father was in March. While the mother's petition on appeal mainly focuses on her progress over the past few months, the caseworker pointed out that the mother was "at roughly forty-four-and-a-half months' of services" throughout the family's two CINA cases.

Under these circumstances, we are not persuaded of any "specific factors, conditions, or expected behavioral changes" that would alleviate the need for removal at the end of an extension. *Id.* We conclude that an extension of time is unwarranted.

## III.  Best Interests

The mother also claims termination of her rights is not in the children's best interests. *See* Iowa Code § 232.116(2). As we often reiterate, the children's "safety and the need for a permanent home" are "the primary concerns when determining [their] best interests." *In re J.E.*, 723 N.W.2d 793, 801 (Iowa 2006) (Cady, J., concurring specially). At the time of the termination hearing, the children were integrated into their respective foster homes. Although the children had been through several placements and experienced months of instability, their current placements were willing and able to integrate them permanently into their families. "It is simply not in the best interests of children to continue to keep them in temporary foster homes while the natural parents get their lives together." *In re A.B.*, 815 N.W.2d 764, 778 (Iowa 2012) (citation omitted). Under these circumstances, termination was in the children's best interests.

## IV.  Reasonable Efforts

In passing, the mother claims the department failed to provide reasonable efforts to assist in this reunification.[7] Specifically, the mother claims she "requested additional visitation with her Children which have been denied."

---

[7] We elect to address her claim despite its bare-bones stature.

Although the department has a duty to make "reasonable efforts" towards reunification," Iowa Code § 232.102A(1)(a), "visitation . . . cannot be considered in a vacuum," *In re M.B.*, 553 N.W.2d 343, 345 (Iowa Ct. App. 1996) (cleaned up). In other words, "the reasonable efforts requirement is not viewed as a strict substantive requirement of termination"; instead, "the State must show reasonable efforts as a part of its ultimate proof the child cannot be safely returned to the care of a parent." *In re L.T.*, 924 N.W.2d 521, 527 (Iowa 2019) (cleaned up).

At the termination hearing, the mother agreed that she raised an issue with visitation to the department in April 2025, and "shortly after" the department moved her to semi-supervised visits. However, "those were pulled back" after the father was arrested for violating the no-contact order. The restriction to the mother's visitation was a direct result of her inability to make changes in her life to demonstrate safe and responsible parenting.

"If services directed at removing the risk or danger responsible for a limited visitation scheme have failed its objective, increased visitation would most likely not be in the child[ren]'s best interests." *M.B.*, 553 N.W.2d at 345. Here, "more visitation would not have resolved the issues that prevented returning the child[ren] to [the mother's] custody." *In re K.S.*, No. 25-1835, 2026 WL 892815, at *2 (Iowa Ct. App. Apr. 1, 2026). Accordingly, the visitation schedule arranged by the department did not cause it to fall short of its obligation to provide reasonable efforts to reunite the mother and the children.

## CONCLUSION

Having addressed the issues raised on appeal, we affirm the termination of the mother's parental rights.

**AFFIRMED.**